IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**NORMAN RAGLE,**

            Plaintiff,

v.

**THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF HINSDALE COUNTY, COLORADO,**

            Defendant.

---

## COMPLAINT AND DEMAND FOR A JURY TRIAL

---

Plaintiff Norman Ragle (herein "Plaintiff" or "Mr. Ragle"), by his attorneys, files this Complaint against the Board of County Commissioners of the County of Hinsdale County, Colorado (herein "Defendant" or "Hinsdale County"). This Complaint and Demand for Jury Trial states two claims against Defendant as follows:

## I.    INTRODUCTION

1.    This is a proceeding for claims of age discrimination and retaliation, economic damages, equitable relief, and injunctive relief to redress the deprivation of rights secured to Plaintiff by the Age in Employment Discrimination Act, 29 U.S.C. §§ 621 *et seq.*, as amended, ("ADEA").

## II.    JURISDICTION

2.    The jurisdiction of the Court over this controversy is invoked pursuant to the provisions of 28 U.S.C. § 1331, and specifically under the ADEA.

3.      Mr. Ragle timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 4, 2019, Charge No. 541-2020-00420, pursuant to the ADEA to exhaust his administrative remedies. Plaintiff received the Notice of Right to Sue on April 22, 2021.

### III.    VENUE

4.      Defendant Hinsdale County is located in the State of Colorado and committed the unlawful employment practices alleged below.  Accordingly, venue lies in the United States District Court for the District of Colorado under 29 U.S.C. § 1391(b).

### IV.    PARTIES

5.      Plaintiff Norman Ragle is a resident of Hinsdale County, Colorado with an address of 822 Hotchkiss Street, PO Box 460, Lake City, CO 81235.  Plaintiff is a person entitled to protection pursuant to the provisions of 42 U.S.C. § 2000e(f) and 29 U.S.C. § 203(e), and shall be treated as an employee within the meaning of the ADEA.

6.      Defendant Hinsdale County was Plaintiff's employer within the State of Colorado.  Defendant's address is 311 Henson St., PO Box 277, Lake City, CO 81235.

7.      Defendant was the "employer" of Plaintiff within the meaning of 29 U.S.C. §§ 630(b) at all times relevant to this action.

### V.    GENERAL ALLEGATIONS

9.      The Hinsdale County Board of County Commissioners oversees the functions of several departments, including the Hinsdale County Road & Bridge Department.

10.     Hinsdale County is one of the remote counties in the lower 48 states.

11.     Hinsdale County is made up of almost 96.5 percent public land according to its website.

12.     Mr. Ragle resides in Lake City, which is a town located within Hinsdale County.

13.     The population of Hinsdale County is approximately 774.

14.     The population of Lake City is approximately 400.

15.     Since it is such a small community, many of the residents are employed by Lake City or Hinsdale County.

16.     Mr. Ragle worked for the Road & Bridge Department ("Hinsdale Road & Bridge Department") of Hinsdale County at the time of his termination.

17.     At the time of his termination from the Hinsdale Road & Bridge Department, Mr. Ragle was 69 years old.

18.     Mr. Ragle's date of birth is February 3, 1950.

19.     Mr. Ragle is currently 71 years old.

20.     During his employment with Hinsdale Road & Bridge Department, Mr. Ragle received several promotions because of his work performance.

21.     Mr. Ragle started out as an equipment operator for Hinsdale Road & Bridge Department.

22.     Mr. Ragle was promoted from equipment operator to working foreman, then promoted to foreman, and ultimately promoted to senior foreman during his employment at Hinsdale Road & Bridge Department.

23.     Mr. Ragle received merit-based pay raises during his employment at Hinsdale Road & Bridge Department.

24.     Mr. Ragle was known for his commitment to safety on the job.

25.     Mr. Ragle was employed by Hinsdale County for the first time from 1972 until 1976.

26.     In 1976, Mr. Ragle voluntarily left his employment with Hinsdale County.

27.     Mr. Ragle returned to the employ of Hinsdale County in 1987 until his March 28, 2019 termination.

28.     At the time of his termination, Mr. Ragle was the oldest employee in the Hinsdale Road & Bridge Department.

29.     In the fall of 2016, Mr. Ragle was placed on medical leave for six months.

30.     For six months, beginning August 8, 2016 until February 1, 2017, Mr. Ragle was on medical leave for shoulder surgery and his related recovery.

31.     Mr. Ragle underwent shoulder surgery on August 8, 2016, and was set to return to work before the end of the year in 2016.

32.     On or around November 1, 2016, Mr. Ragle had to undergo a second surgery because of unanticipated complications from his August 2016 shoulder surgery.

33.     Mr. Ragle returned to work on February 1, 2017.

34.     On or around September 24, 2016, while Mr. Ragle was on medical leave, Monte Hannah, former Hinsdale Road & Bridge Department Supervisor, was assigned as Mr. Ragle's supervisor.

35.      At the time he became the Department Supervisor, Mr. Hannah was approximately 51 years old.

36.      Mr. Hannah is currently 56 years old.

37.      While Mr. Ragle was out on medical leave, it was important to Mr. Ragle, as the Senior Foreman, to maintain his working relationships with the Hinsdale Road & Bridge Department employees.

38.      Mr. Ragle would occasionally stop by the Hinsdale Road & Bridge Department shop to bring donuts, cookies, and summer sausages while catching up with his co-employees.

39.       On December 7, 2016, Mr. Ragle visited the Hinsdale Road & Bridge Department shop to talk to Mr. Hannah about his recovery and the date of his expected return.

40.      Mr. Hannah took Mr. Ragle to a road project on which the crew was working at County Road 30.

41.      Shortly after Mr. Hannah became the Department Supervisor, Richard (Butch) Hurd was harassed and discriminated against by Mr. Hannah and other employees.

42.      Hr. Hurd was wrongfully terminated based on his age.

43.      Mr. Hurd was approximately 55 years old when the discriminatory comments were made.

44.      Mr. Hurd was a long-time employee of Hinsdale County at the time of his termination.

45.     Mr. Hurd was working on the crew that Mr. Hannah took Mr. Ragle to on December 7, 2016.

46.     While Mr. Hannah was driving Mr. Ragle around to road projects on December 7, 2016, Mr. Hannah told Mr. Ragle that Mr. Ragle needed to retire.

47.     On December 7, 2016, for the first time, Mr. Hannah told Mr. Ragle that Mr. Ragle needed to retire because of Mr. Ragle's age.

48.     On December 7, 2016, for the first time, Mr. Hannah told Mr. Ragle that he, Mr. Hannah, wanted to hire younger employees.

49.     On December 7, 2016, after Mr. Ragle visited the Hinsdale Road & Bridge Department, Mr. Hurd visited Mr. Ragle at his home.

50.     Mr. Ragle was told by Mr. Hurd that Mr. Hannah, with the assistance of JoAllen Blowers and Don Menzies, was trying to terminate Mr. Hurd's employment with Hinsdale County.

51.     Mr. Hurd told Mr. Ragle that Mr. Hannah, Mr. Blowers, and Mr. Menzies made comments about Mr. Hurd's age and how Mr. Hurd needed to retire.

52.     Mr. Hurd also informed Mr. Ragle that Mr. Hannah had placed him, Mr. Hurd, on administrative leave.

53.     Mr. Ragle worked with Mr. Hurd for approximately 30 years.

54.     Mr. Hurd was able to perform his job, and did so.

55.     Mr. Hurd warned Mr. Ragle that Mr. Hannah was going to try and fire Mr. Ragle when Mr. Ragle returned to work.

56.     After Mr. Hurd spoke to Mr. Ragle about Mr. Hurd's fear of being fired due to his age, Mr. Hannah terminated Mr. Hurd's employment on January 3, 2017.

57.     The Hinsdale Road & Bridge Department had a happy and very tight-knit crew before Mr. Hannah became the Supervisor in October 2016.

58.     While Mr. Ragle was out on medical leave, Mr. Hannah temporarily assigned Mr. Ragle's Senior Foreman duties to JoAllen Blowers.

59.     JoAllen Blowers was born in 1973 and was approximately 44 years old when assigned Mr. Ragle's Senior Foreman duties.

60.     Mr. Blowers is currently 48 years old.

61.     Upon his return to work, Mr. Ragle expected to have his Senior Foreman responsibilities assigned back to him since he was healthy and able to perform all his job-related duties.

62.     When Mr. Ragle returned to work on February 1, 2017, he did not have any work restrictions.

63.     When Mr. Ragle returned to work on February 1, 2017, he had full motion and use of his shoulder.

64.     Mr. Hannah's age discrimination against Mr. Ragle escalated after Mr. Ragle's return to work on February 1, 2017.

65.     Starting at the time Mr. Ragle returned to work after shoulder surgery and until his March 28, 2019 termination, Mr. Ragle was regularly referred to as "old man", "old fart", "dead man walking," "old balls", "crippled old man", "old dead flame", "old

senior citizen", and "old bones" by Mr. Hannah, Mr. Blowers, Donald (Don) Menzies, Breck Thompson, and Johnny Bebout.

66.     After Mr. Ragle returned to work on February 1, 2017, age related comments were made to Mr. Ragle almost daily by Mr. Menzies, Mr. Blower, Mr. Hannah, and Mr. Bebout.

67.     Don Menzies worked as a mechanic for Hinsdale Road & Bridge Department.

68.     Mr. Menzies is currently 46 years old.

69.     Breck Thompson worked as a heavy equipment operator for Hinsdale Road & Bridge Department.

70.     Mr. Thompson was born in December 1963.

71.     Mr. Thompson currently 57 years old.

72.     John "Johnny" Bebout, Jr. worked as a heavy equipment operator for Hinsdale Road & Bridge Department.

73.     Mr. Bebout is currently 57 years old.

74.     After Mr. Ragle's return to work on February 1, 2017, Mr. Hannah and other employees regularly made allegations about Mr. Ragle that were untrue.

75.     Statements made by Hinsdale Road & Bridge Department employees younger than Mr. Ragle about his age were based upon negative stereotypes about older workers.

76.     Mr. Blowers alleged that Mr. Ragle could not hear.

77.     Mr. Blowers, Mr. Hannah, and Mr. Menzies alleged that Mr. Ragle was unable to learn new tasks and policies.

78.     Throughout his employment with Hinsdale County, Mr. Ragle was well liked and well-received by other employees during his long career.

79.     Upon Mr. Ragle's return to work on February 1, 2017, the other Hinsdale Road & Bridge Department employees did not welcome Mr. Ragle back to work.

80.      Upon Mr. Ragle's return to work on February 1, 2017, the other Hinsdale Road & Bridge Department employees' interactions were short and cold when they spoke to Mr. Ragle.

81.     The next day, February 2, 2017, Mr. Hannah prohibited Mr. Ragle from taking his grandson to school.

82.     For years, Mr. Ragle drove his grandson to school because he was the legal guardian of his grandson.

83.     Mr. Ragle's grandson has disabilities that require Mr. Ragle's care.

84.     Mr. Ragle's duty as the guardian and provider for his grandson, including taking him to school, did not interfere with his job duties.

85.     When Mr. Ragle spoke about his grandson, Mr. Hannah referred to Mr. Ragle's grandson as a "retard."

86.     Even though Mr. Hannah prohibited Mr. Ragle from taking his grandson to school, he allowed younger employees, including Joseph (Joe) Schultheis, to bring their children to work.

87.     Mr. Schultheis' two young children came to the Hinsdale Road & Bridge Department shop during work hours.

88.     Having children near the large road equipment created a safety issue and interfered with the workday.

89.     Mr. Schultheis was not admonished or disciplined for bringing his children to work.

90.     Mr. Schultheis was born in November 1979 and was approximately 37 years old when Mr. Hannah permitted him to bring his children to the Hinsdale Road & Bridge Department shop.

91.     On February 3, 2017, Mr. Hannah again told Mr. Ragle that Mr. Ragle needed to retire because of his age.

92.     Mr. Hannah permitted other employees to create a hostile work environment because of Mr. Ragle's age.

93.     Mr. Menzies regularly called Mr. Ragle age-based names, told Mr. Ragle that he was going to wake up in a funeral home or a coffin, and that Mr. Ragle was "older than dirt."

94.     Mr. Menzies also made comments implying Mr. Ragle was stupid because of his age, like "how can a guy be that old and not know nothing."

95.     On March 28, 2017, Mr. Hannah told Mr. Ragle that he called a crew meeting for the next day because Mr. Blowers, Mr. Ragle's subordinate, had issues with Mr. Ragle.

96.     Mr. Blowers falsely told Mr. Hannah that Mr. Ragle ignored Mr. Blowers when he made suggestions for a project.

97.     The statement was false because Mr. Blowers did not talk to Mr. Ragle or make suggestions to Mr. Ragle that Mr. Ragle ignored.

98.     During Mr. Ragle's six-month medical leave, Mr. Blowers performed some of Mr. Ragle's Senior Foreman duties.

99.     Mr. Ragle believed Mr. Blowers did not like Mr. Ragle's return based on Mr. Blowers' negative treatment of Mr. Ragle.

100.    It appeared to Mr. Ragle that Mr. Blowers wanted to stay in the Senior Forman position.

101.    The next day, March 29, 2017, Mr. Ragle attended the all-crew meeting.

102.    Mr. Ragle felt that Mr. Hannah wanted him to quit based on Mr. Hannah's lack of support and negative attitude toward Mr. Ragle.

103.    During the meeting, nothing was said about Mr. Ragle's alleged refusal to listen to Mr. Blowers.

104.    Mr. Blowers became extremely agitated and aggressive in the March 29, 2017 meeting.

105.    Mr. Blowers never shared what "issues" he allegedly had with Mr. Ragle.

106.    Mr. Blowers just kept saying Mr. Ragle wasn't the "boss" of him.

107.    Mr. Ragle, as the Senior Foreman, was Mr. Blower's boss.

108.    Mr. Blowers action's made Mr. Ragle fear that Mr. Blowers would take physical action against Mr. Ragle.

109.    At the March 29, 2017 meeting, Mr. Blowers got out of his chair and yelled at Mr. Ragle inches away from Mr. Ragle's face.

110.    Mr. Hannah did nothing to intervene when he witnessed Mr. Blowers' actions toward Mr. Ragle.

111.    Afterward, Mr. Ragle asked Mr. Hannah why he did not intervene when Mr. Blowers almost became physical.

112.    Mr. Hannah laughed and said that he "wanted to see how far it would go."

113.    As a result of the meeting, Mr. Ragle wrote up a report based on Mr. Blowers' insubordination and verbal assaults against him.

114.    Mr. Ragle filed the report about Mr. Blower's actions with Mr. Hannah to ensure there was a record in case Mr. Blowers' actions escalated.

115.    Mr. Hannah took no corrective or disciplinary action against Mr. Blowers for his insubordination and discriminatory actions toward Mr. Ragle.

116.    As the months progressed, Mr. Hannah's discriminatory comments continued.

117.    Other Hinsdale Road & Bridge Department employees, as a result of Mr. Hannah's openly discriminatory attitude, also began calling Mr. Ragle names and treating him less favorably than younger employees.

118.    Mr. Schultheis commonly referred to Mr. Ragle as "Senior Road Dickhead Foreman."

119.    Mr. Thompson and Mr. Bebout often called Mr. Ragle "old man" when addressing and speaking to him.

120.    On May 28, 2017, Mr. Hannah told Mr. Ragle that Mr. Blowers had again stated that Mr. Blowers had issues with Mr. Ragle ignoring him when he made suggestions.

121.    Mr. Blowers alleged that Mr. Ragle did not listen to his ideas.

122.    It is a false allegation that Mr. Ragle did not listen to Mr. Blowers' ideas.

123.    Mr. Blowers did not speak to Mr. Ragle about work and did not share ideas with Mr. Ragle.

124.    Mr. Blowers only spoke to Mr. Ragle when making derogatory comments about Mr. Ragle's age.

125.    Mr. Hannah implied that Mr. Ragle allegedly couldn't hear Mr. Blowers because he is old.

126.    Mr. Ragle could hear without assistive devices.

127.    For fear of losing his job, Mr. Ragle purchased, out of pocket, hearing aids, although they were not medically necessary.

128.    Mr. Blowers regularly damaged operating equipment and did not follow county policies, including failing to refuel equipment.

129.    Mr. Blowers was never disciplined or terminated for his poor performance.

130.    On July 6, 2017, Mr. Hannah instructed Mr. Menzies that Mr. Ragle was prohibited from climbing up and down equipment ladders to assist with patching holes on road projects.

131.    Mr. Hannah said that Mr. Ragle could not climb up a ladder because of his age.

132.    Mr. Ragle is able bodied and capable of performing job duties that involved climbing up and down ladders.

133.    Mr. Ragle did not have any work-related restrictions.

134.    Mr. Hannah's prohibition against Mr. Ragle climbing up and down ladders was because of his age.

135.    On August 14, 2017, Mr. Menzies made a comment about how he was shocked that Mr. Ragle was still alive.

136.    Mr. Menzies' disparaging comment about Mr. Ragle's age showed open and blatant age bias and hostility toward Mr. Ragle.

137.    Mr. Blowers, before most of Mr. Ragle's shifts, would leave the bulldozer tracks and the excavator tracks full of frozen dirt or ice.

138.    This was against Hinsdale County practice.

139.    On many occasions, the frozen dirt or ice made it extremely difficult for Mr. Ragle to operate the bulldozer and could lead to injuring himself or damaging the equipment.

140.    Mr. Blowers properly cleaned the bulldozer tracks when employees who were younger than Mr. Ragle were scheduled to work after him.

141.    Mr. Hannah condoned the disparate treatment toward Mr. Ragle by not taking any corrective or disciplinary action against the younger employees who harassed Mr. Ragle.

142.    When Mr. Ragle used the radio to call for assistance or seek an answer to a work-related question, no other employees would answer his call.

143.    It was against Hinsdale Road & Bridge Department policy to ignore work calls or requests for assistance from another employee and created potential safety risks.

144.    Mr. Ragle's timecards, glasses, and other personal belongings would regularly go missing. This did not happen with younger employees' belongings.

145.    Beginning when Mr. Ragle returned to work from shoulder surgery on February 1, 2017 and until his termination on March 28, 2019, the instances regarding the bulldozer conditions, refusing to answer Mr. Ragle's radio calls, and taking his belongings occurred almost daily.

146.    The disparate treatment toward Mr. Ragle interfered with Mr. Ragle's ability to do his job, but despite the discriminatory conduct, he performed satisfactorily.

147.    When Mr. Ragle tried to eat lunch with his crew, they got up and walked away.

148.    Prior to Mr. Hannah becoming their Supervisor, Mr. Ragle's employees ate lunch with him often.

149.    After Mr. Ragle's return from shoulder surgery on February 1, 2017, Mr. Hannah instructed Hinsdale Road & Bridge Department employees to avoid interacting with Mr. Ragle.

150.    On May 16, 2018, Mr. Ragle was clearing snow off of a road with a Caterpillar 938 when the fuel pump on the Caterpillar 938 broke down.

151.    The fuel pump is critical to the proper function of the Caterpillar 938.

152.    On May 16, 2018, Mr. Ragle radioed for assistance when the fuel pump of the Caterpillar 938 broke down.

153.    Each Hinsdale Road & Bridge Department employee has a radio on them during each shift, which allows for fast communication in case assistance is required.

154.    No one responded to Mr. Ragle's request for assistance on May 16, 2018.

155.    On May 16, 2018, as a result of the other employees' lack of response and assistance, Mr. Ragle radioed the Sheriff's department.

156.    The dispatcher, Bobby McDonald, called the Hinsdale Road & Bridge Department shop to request assistance for Mr. Ragle regarding the equipment failure.

157.    Ms. McDonald also informed Mr. Hannah about Mr. Ragle's request for assistance.

158.    Mr. Hannah called Mr. Menzies at the Hinsdale Road & Bridge Department shop over the radio.

159.    On May 16, 2018, when Mr. Hannah called Mr. Menzies regarding Mr. Ragle's request for assistance, Mr. Hannah falsely stated that Mr. Ragle was having a heart attack.

160.    The radio transmits to the entire Hinsdale County, so the Sheriff's department and EMT heard Mr. Hannah's statements.

161.    Mr. Hannah's false report caused the Sheriff's office and EMT to respond to Mr. Ragle's call for work-related assistance.

162.    Ms. McDonald responded over the radio stating that Mr. Ragle needed work-related assistance and was not experiencing a medical emergency to ensure medical responders did not respond to Mr. Hannah's false report.

163.    A few days later, on May 22, 2018, while Mr. Ragle was operating the 1987 Caterpillar 936E, the brakes and steering stopped working while clearing the road.

164.    As a result of the equipment failure, Mr. Ragle did not have control of the 1987 Caterpillar 936E and was unable to stop it.

165.    The 1987 Caterpillar 936E slowly slid down the slope and eventually stopped.

166.    Mr. Ragle exited the 1987 Caterpillar 936E and shut off the engine.

167.    As a result of the 1987 Caterpillar 936E equipment failure, Mr. Ragle sustained injuries for which he went to the hospital.

168.    Mr. Ragle was out of work for almost two months because of the injuries.

169.    The 1987 Caterpillar 936E equipment failure was not caused by Mr. Ragle.

170.    Mr. Hannah discriminatorily determined that the May 22, 2018 incident was caused by Mr. Ragle's "carelessness."

171.    On July 17, 2018, Mr. Hannah issued a written Employee Warning Notice as a result of an incident that occurred on May 22, 2018.

172.    During their July 17, 2018 meeting, Mr. Hannah also told Mr. Ragle that Mr. Ragle needed to retire so Mr. Hannah could hire younger employees.

173.    Even though, Mr. Hannah blamed the incident on Mr. Ragle's alleged carelessness in operating the equipment, he also stated, "in the future ensure that the equipment is 100% safe and ready to use."

174.    Mr. Hannah's statement within Mr. Ragle's Written Warning reflects Mr. Hannah's knowledge that Mr. Ragle's operation of the vehicle was not the cause.

175.    Mr. Hannah ordered Mr. Ragle to continue using the 1987 Caterpillar 936E knowing it had ongoing issues.

176.    Mr. Hannah was aware of a safety issue regarding the equipment for over a year prior to the May 22, 2018 incident.

177.    On March 17, 2017, Mr. Thompson and Mr. Ragle were working on a screening project at Clawson Mesa.

178.    Mr. Thompson informed Mr. Ragle that the brakes on the 1987 Caterpillar 936E were not working.

179.    Mr. Thompson and Mr. Ragle discovered the brake fluid canisters on the 1987 Caterpillar 936E were extremely rusted, which is a sign of water damage.

180.    The 1987 Caterpillar 936E brake fluid canisters had no fluid.

181.    As an immediate and short-term fix, Mr. Thompson and Mr. Ragle added brake fluid to the 1987 Caterpillar 936E and continued working.

182.    At the end of Mr. Ragle's shift on March 17, 2017, Mr. Ragle informed Mr. Hannah that the 1987 Caterpillar 936E needed a brake repair immediately.

183.    Mr. Ragle suggested that the 1987 Caterpillar 936E not be used until it was repaired.

184.   Mr. Hannah ignored Mr. Ragle's request for a brake repair on the 1987 Caterpillar 936E

185.   The 1987 Caterpillar 936E was not repaired or taken off the road.

186.   Hinsdale Road & Bridge Department employees continued to use the 1987 Caterpillar 936E on road projects.

187.   Over the next year, Mr. Ragle informed Mr. Hannah at least four times of the continued brake safety issue with the 1987 Caterpillar 936E.

188.   All of Mr. Ragle's complaints and requests for repair to the 1987 Caterpillar 936E were ignored.

189.   Three times in May 2017, including May 17,18, and 22 of 2017, Mr. Thompson and Mr. Blowers complained of issues with the 1987 Caterpillar 936E.

190.   On June 20, 2017, Mr. Thompson complained that the 1987 Caterpillar 936E did not have brake fluid after he used the piece of equipment for a project on Carson Road.

191.   Mr. Ragle was frustrated that Mr. Hannah did not take the 1987 Caterpillar 936E out of rotation.

192.   Mr. Ragle feared that he or another employee would get injured while operating the 1987 Caterpillar 936E.

193.   The 1987 Caterpillar 936E's brake problems and related equipment failures were experienced by the Hinsdale Road & Bridge Department employees.

194.   Gavin McNitt and Mr. Thompson complained about 1987 Caterpillar 936E because of the known brake issues.

195.    On May 21, 2018, a day before the incident involving the 1987 Caterpillar 936E that resulted in Mr. Hannah issuing Mr. Ragle a Written Warning, Mr. Hannah requested that Mr. Ragle take that specific piece of equipment, the 936E Caterpillar Loader, to Nellie Creek for a road clearing, which is where the incident occurred the next day.

196.    A different piece of equipment could have completed the road clearing on Nellie Creek.

197.    Mr. Hannah, aware of the ongoing brake issues on the 1987 Caterpillar 936E, specifically requested that Mr. Ragle use the 936E Caterpillar Loader on Nellie Creek.

198.    The July 17, 2018 Employee Warning Notice given to Mr. Ragle was not a result of carelessness, but due to equipment failure that was known and not addressed by Mr. Hannah for over a year.

199.    Moreover, issues with the 936E Caterpillar Loader persisted after the May 22, 2018 incident.

200.    On February 27, 2019, Jeff Lanktree and Mr. Thompson mentioned issues with the brakes.

201.    Despite other employees complaining about and having issues with the 1987 Caterpillar 936E Loader, Mr. Ragle was the only employee given a written warning.

202.    On February 27, 2019, Mr. Thompson complained that the 1987 Caterpillar 936E brakes would not stop on a hill and rolled for several seconds before stopping.

203.    On Saturday, February 9, 2019, it began snowing in Hinsdale County.

204.    As Senior Foreman, it was Mr. Ragle's responsibility to oversee and supervise snow removal.

205.    When it snowed on a weekend day, Mr. Ragle would pay attention to the amount and gauge whether snow removal would be necessary.

206.    On February 9, 2019, Mr. Ragle drove to the Hinsdale Road & Bridge Department shop because there was snow that needed to be plowed.

207.    Mr. Ragle plowed some of the nearby area on County Road 30.

208.    When Mr. Ragle arrived back at the Hinsdale Road & Bridge Department shop after plowing County Road 30, Mr. Hannah prohibited Mr. Ragle from clearing any more snow off the roads.

209.    Mr. Hannah stated that he did not want Mr. Ragle working overtime moving forward.

210.    Mr. Thompson was permitted to work overtime that day, February 9, 2019, to clear snow off the roads.

211.    Younger employees were permitted and encouraged to work overtime.

212.    Mr. Hannah prohibited Mr. Ragle from accruing overtime while younger employees were permitted to work overtime.

213.    Sometimes overtime is necessary due to snowstorms or other natural disasters that require immediate attention to make the roads safe for travel.

214.    For example, in March 2019, the San Juan Mountains, where Hinsdale County is located, received an abnormally large amount of snow, almost 200% more than normal.

215.    The Colorado Sun ran an article on May 28, 2019 about all the snow and the impact the snow run off had on Lake City.

216.    Hinsdale County also experienced several avalanches during the Spring of 2019.

217.    The amount of snow and avalanche damage in Hinsdale County created a lot of additional work for the Hinsdale Road & Bridge Department.

218.    Hinsdale Road & Bridge Department employees younger than Mr. Ragle were permitted to work overtime as necessary during the busy time.

219.    Mr. Hannah prohibited Mr. Ragle from earning overtime during this busy season.

220.    Mr. Hannah's refusal to allow Mr. Ragle to earn overtime was further discrimination against Mr. Ragle as an older worker.

221.    On February 22, 2019, when Mr. Ragle returned to the Hinsdale Road & Bridge Department shop from a road project, Mr. Menzies told Mr. Ragle that he was watching while Mr. Ragle worked.

222.    Mr. Menzies told Mr. Ragle on February 22, 2019 that Mr. Ragle worked too slow.

223.    Mr. Menzies' comment to Mr. Ragle that Mr. Ragle "worked too slow" was because of Mr. Ragle's age.

224.    On March 5, 2019, upon Mr. Ragle's arrival at work, he experienced trouble entering the Caterpillar 140 Grader.

225.    Mr. Blowers, who had the shift before Mr. Ragle, had parked the Caterpillar 140 Grader in a dangerous position.

226.    The driver side of the Caterpillar 140 Grader was high off the ground making it extremely difficult for Mr. Ragle to safely climb into the driver seat.

227.    Mr. Ragle immediately checked the Caterpillar 140 Grader's fuel, oil, and anti-freeze due to Mr. Blower's pattern of intentionally leaving equipment in poor working order when Mr. Ragle was scheduled to work after Mr. Blowers.

228.     The fuel of the Caterpillar 140 Grader was low.

229.    It is Hinsdale Road & Bridge Department policy for employees to refuel and check the equipment overall at the end of their shift.

230.    Mr. Blowers regularly violated this policy in his efforts to create a hostile work environment for Mr. Ragle.

231.    Mr. Ragle informed Mr. Hannah of the dangerous conditions that Mr. Blowers left the Caterpillar 140 in prior to and in anticipation of Mr. Ragle's shift.

232.    Mr. Hannah laughed at Mr. Ragle in front of the other employees and took no disciplinary action against Mr. Blowers.

233.    During the week of March 18, 2019, Mr. Hannah begin telling Mr. Ragle that he could not "find" jobs for Mr. Ragle to work on.

234.    As the Senior Foreman, Mr. Ragle's duties should have included monitoring the progress of current projects, scheduling the crew, and assigning crew member tasks on current and upcoming projects.

235.    There were multiple ongoing projects, including projects related to the recent Hinsdale County avalanches as a result of all of the snow fall that spring.

236.    Mr. Hannah's excuse that there was not enough work for Mr. Ragle was pretextual and caused by him prohibiting Mr. Ragle from performing all of his Senior Foreman duties.

237.    Instead of allowing Mr. Ragle to perform his Senior Foreman job duties, Mr. Hannah assigned Mr. Ragle other tasks, such as digging out equipment stuck in the snow.

238.    Employees younger than Mr. Ragle were assigned to work on the ongoing projects, including the cleanup from the recent avalanches.

239.    On Friday, March 22, 2019, Mr. Ragle texted Mr. Hannah complaining of age discrimination.

240.    In that text message to Mr. Hannah, Mr. Ragle also requested to be treated equally to his younger peers and stated how poorly he was treated by Mr. Hannah and other employees since Mr. Hannah became Mr. Ragle's supervisor.

241.    On Monday, March 25, 2019, Mr. Hannah demoted Mr. Ragle in front of the other Hinsdale Road & Bridge Department employees.

242.    Mr. Hannah stated that Mr. Ragle was no longer Senior Road Foreman.

243.    He stated that Mr. Bebout was the new Foreman of the Hinsdale Road & Bridge Department.

244.    Mr. Hannah also told Mr. Ragle that his pay would be reduced from Senior Foreman to operator wages.

245.    Three days later, on March 28, 2019, Mr. Hannah wrongfully terminated Mr. Ragle's employment based on his age and protected complaints of discrimination.

## VI.    FIRST CLAIM FOR RELIEF
### Age Discrimination in Employment Act, 29 U.S.C. §§ 623 *et seq*., Age Discrimination

246.    Plaintiff incorporates by reference all paragraphs of this Complaint as though fully and separately stated herein.

247.    At all times relevant to this case, Plaintiff has been at least 40 years of age and therefore protected by the ADEA, 29 U.S.C. §§ 621 – 634.

248.    At all times relevant to this case, Defendant was an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b).

249.    Although Plaintiff at all relevant times successfully performed his job, Defendant demoted Plaintiff, reduced his pay, and ultimately terminated his employment while opportunities were given to younger, less experienced employees.

250.    As a result of Defendant's above-described conduct, Defendant violated the ADEA and discriminated against Plaintiff by targeting, disparaging, and harassing him, demoting him, reducing his pay, and terminating him because of his age.

251.    Defendant's above-described conduct was intentional and was motivated by Plaintiff's age.

252.    Defendant knowingly and willfully engaged in the above-described conduct and discriminatory treatment of Plaintiff because of his age.

253.    Defendant would not have demoted, reduced Plaintiff's pay, and terminated Plaintiff but for Plaintiff's age.

254.    As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, humiliation, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, liquidated damages and attorneys' fees and costs as permitted by law.

## VII.    SECOND CLAIM FOR RELIEF
### Age Discrimination in Employment Act, 29 U.S.C. §§ 623 *et seq.*,
### Age Retaliation

255.    Plaintiff incorporates by reference the above paragraphs of this Complaint as though fully and separately stated herein.

256.    Plaintiff engaged in activity protected by the ADEA pursuant to 29 U.S.C. § 623(d) when he reported discrimination and conduct targeting his age to his supervisor.

257.    Defendant unlawfully retaliated against Plaintiff because of Plaintiff's statutorily protected opposition to discriminatory acts against him including, but not limited to, demoting Plaintiff, reducing his pay, and terminating his employment at Hinsdale County.

258.    A causal connection exists between Plaintiff's protected activities and the Defendant's unlawful materially adverse employment actions.

259.    Defendant acted knowingly and willfully in engaging in the above-described age-related employment practices and retaliatory treatment of Plaintiff, in that Defendant knew or showed reckless disregard that its conduct was prohibited by the ADEA.

260.    As a direct and proximate result of Defendant's above-described age-related employment practices, Plaintiff has suffered damages, including lost wages and benefits; and he is entitled to such general and special damages, economic losses, liquidated damages, and attorneys' fees and costs as permitted by law.

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

A.      Reinstatement with full backpay, and benefits;

B.      A permanent injunction enjoining Defendant, its management personnel, employees, agents, successors, assigns, and all other persons in active concert or participation with them, from engaging in any employment practice which discriminates on the basis of age;

C.      An Order requiring Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for older workers and eradicate the effects of past and present unlawful employment practices;

D.      An Order requiring Defendant to make the Plaintiff whole by providing him with appropriate lost earnings and benefits, and other economic loss, with pre-judgment interest, in amounts to be proved at trial, and other affirmative relief necessary to

eradicate the effects of its unlawful employment practices including, but not limited to, increasing Plaintiff's pay in accordance to his younger peers;

   E. That this Court retain jurisdiction over this action until Defendant has fully complied with the orders of this Court, and that this Court require Defendant to file any and all reports necessary and to supervise compliance with law that any and all matters related hereto be done in conformance with the applicable ADEA provisions;

   F. Liquidated damages;

   G. For lost monies and damages pertaining to out-of-pocket expenses;

   H. Such further relief as the Court deems just, necessary and proper;

   I. Pre-and-post-judgment interest; and

   J. Costs and attorneys' fees incurred in this action.

## **JURY TRIAL DEMAND**

   The Plaintiff hereby requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted this 16th day of July 2021.

TRUHLAR and TRUHLAR, L.L.P.

*s/Christine E. Breen*
Christine E. Breen
Truhlar and Truhlar, L.L.P.
7340 E. Caley Avenue, Suite 310
Centennial, CO 80111
Phone: 303-794-2404
Fax: 303-794-1142
Email: cbreen.truhlar@gmail.com
Attorney for Plaintiff

*s/Robert J. Truhlar*
Robert J. Truhlar
Truhlar and Truhlar, L.L.P.
7340 E. Caley Avenue, Suite 310
Centennial, CO 80111
Phone: 303-794-2404
Fax: 303-794-1142
Email: roberttruhlar@att.net
Attorney for Plaintiff

**PLAINTIFF'S ADDRESS**:

Norman Ragle
822 Hotchkiss Street
P.O. Box 460
Lake City, CO 81235